**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION** |
| **v.** | ) | |
| | ) | **NO. 18-40014-TSH** |
| **ERICK CRUZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>ORDER AND MEMORANDUM ON DEFENDANT'S MOTION TO SUPPRESS (Docket No. 110)</u>**

**March 19, 2019**

**HILLMAN, D.J.**

Erick Cruz ("Defendant") moves this Court to suppress the evidence obtained as a result of the interception of wire communications. For the reasons stated below, Defendant's motion (Docket No. 110) is ***denied***.

## Background

Beginning in the summer of 2016, DEA officials suspected Jorge Burgos was involved in selling large quantities of cocaine and heroin in and around Worcester, Massachusetts. Before obtaining a wiretap from this Court, the Government had investigated Burgos for over a year. (Docket No. 112-1 ¶ 75) ("Wiretap Aff."). During that time, the Government employed several investigative methods including: statements of confidential sources, physical surveillance, monitored and or/recorded phone calls, pen register and trap-and-trace information, telephone records, seizing and searching a package found to contain three kilograms of cocaine, and queries of law enforcement records and intelligence databases. *Id.* ¶ 76.

These investigations revealed that Burgos purchased drugs from Deibby Garcia to resell to his own customers. *Id.* ¶54. For example, on November 13, 2017, Burgos allegedly purchased, or attempted to purchase cocaine from Garcia. *Id.* ¶¶ 40-52. Also, in October 2017, a confidential source made three controlled purchases from Burgos. *Id.* ¶ 36. In addition, agents made eleven controlled purchases of narcotics from Jose Ortiz and Roberto Ortiz, suspected members of Burgos' operation. *Id.* ¶ 34.

In December 2017, investigators still lacked detailed information on Burgos' drug trafficking organization and began to focus on Garcia who appeared to be Burgos' main supplier. Consequently, the Government obtained a wiretap authorized by this Court on Garcia's cell phone to learn more about the source of narcotics being distributed, the location of drugs being distributed, and the distributors.

The Government had limited success in learning about Garcia's organization through normal investigative methods including physical surveillance, confidential sources, prior wiretaps, and phone records. *Id.* ¶¶ 77-78. The Government argued that although confidential sources bought drugs from Burgos, they were unlikely to gain the information necessary to penetrate the internal operations of Garcia's and Burgos' drug trafficking organizations. *Id.* For example, informants were not privy to information such as sources of supply or the intended transportation route of the Burgos DTO. *Id.* ¶. 88. Accordingly, the Government asserted wiretap was necessary to fully reveal the manner and scope in which Garcia and his associates were involved in drug trafficking and because evidence was unavailable from other investigative avenues. *Id.* ¶ 150.

Communications intercepted following the wiretap revealed that Garcia distributed cocaine to several individuals in the Worcester area and received his supply from Puerto Rico. *See generally* Cruz Aff. Investigation further revealed that Defendant Cruz, a United States Postal

Service ("USPS") Letter Carrier, conspired with Garcia to arrange the delivery of packages of cocaine shipped from Puerto Rico to addresses located on Defendant's USPS route. *Id.* ¶ 24. Defendant would then get the packages and give them to Garcia. *Id.* Defendant used a phone subscribed in his name to communicate with Garcia. *Id*. ¶ 54. Agents confirmed that the address listed for that phone number was Defendant's. *Id*.

In January 2018, Defendant texted Garcia two addresses in Marlborough to enable Garcia's supplier in Puerto Rico to ship two packages of cocaine to an address on Defendant's USPS route. *Id.* ¶¶ 57-63. Upon retrieving those packages, Defendant was to transfer the packages to Garcia. *Id*. However, while in transit, a trained narcotic sniffing canine positively alerted to the package. *Id*. ¶ 64. After a search warrant was obtained for the package, it tested positive for the presence of cocaine. *Id.* ¶ 65. On the morning of January 16, 2018, US Postal Inspectors arranged for the second package to be placed in Defendant's ordinary deliveries. *Id*. ¶ 66.

On January 16, 2018, Defendant retrieved the second package and arranged with Garcia to have a woman pick up the package. *Id.* ¶¶ 66-72. Later that day, agents observed the Defendant meet with a woman in the Marlborough area and give her a package. *Id.* ¶ 73. Shortly thereafter, agents retrieved that package, which contained cocaine, from the woman and arrested Defendant. *Id.* ¶¶ 73-80. Defendant identified a photo of Garcia's brother as the individual who paid him $500 for a previous delivery in December 2017. *Id.* ¶ 81.

In January 2018, Defendant was indicted and charged with one count of conspiracy to distribute cocaine, one count of possession of cocaine with the intent to distribute and one count of utilization of a communication facility in furtherance of narcotics trafficking offense. (Docket No. 2-2).

## Rulings of Law

*1. Wiretap*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, promulgates the standards and procedures for the use of electronic surveillance. A judge may allow an application for interception of wire communications only when the following conditions are met:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous; and
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or area about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendant contends that the Government failed to satisfy the third requirement, commonly referred to as the "necessity" requirement. 18 U.S.C. § 2518(3)(c).

*a. Necessity*

The "necessity" requirement demands that "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Rodrigues*, 850 F.3d 1, 9 (1st Cir. 2017) (quotation marks and citations omitted). Accordingly, the wiretap applicant must show that "the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Martinez*, 452 F.3d 1, 4 (1st Cir. 2006) (quotation marks and citations omitted). The First Circuit has ruled however that "the government is not required to show that other investigative methods have been wholly unsuccessful, nor must the government

exhaust all other investigative measures before resorting to wiretapping." *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. 2010) (citations omitted).

In order to satisfy the necessity requirement, the government must show that it "has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence—to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986). However, "bare conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience" are not enough to satisfy the necessity requirement. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989).

Defendant argues that the Government prematurely acquired a wiretap before it utilized normal investigative methods. According to Defendant, it was therefore impossible to ascertain whether the wiretap was necessary. Defendant further argues that traditional methods, including confidential sources, physical surveillance, and search warrants in conjunction with other wiretaps were yielding successful results. Defendant, however, fails to consider the broad goals of the investigation. While traditional investigative may have been sufficient to prosecute Burgos, they would not have been enough to successfully unearth his suppliers and prosecute co-conspirators.

For example, in *United States v. Rivera*, the defendant similarly argued that traditional investigative methods were yielding results and "there was no reason to believe that they were unlikely to succeed." 267 F. Supp. 3d 275, 276-77 (D. Mass 2017). The court concluded that the necessity requirement was met because, in addition to other factors, the affidavit stated, "the investigative objects that had not yet been met that justified a wiretap." *Id.* at 277; *see also United States v. David*, 940 F.2d 722, 729 (1st Cir. 1991) ("An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up

a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed."); *United States v. Delima*, 886 F.3d 64, 70 (1st Cir. 2018) ("We have upheld wiretap applications supported by affidavits that explain why the continued use of traditional investigative techniques (such as confidential sources, grand jury subpoenas, search warrants, surveillance and consensual monitoring) would be ineffective in uncovering the full scope of the potential crimes under investigation.") (internal citations omitted); *United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003) (holding that the government's affidavit stating "that a wiretap was necessary to uncover the full scope of the conspiracy, including conclusive proof of identity and information as to how the drug sales were made" contained the requisite details "regarding its inability to purse the criminal activity through less intrusive means").

Here, the Government detailed the shortcomings of the investigative methods previously utilized. For example, the informant had "no knowledge of and no ability to purchase narcotics from" Burgos' suspected cocaine suppliers. *Id.* ¶ 86. Additionally, physical surveillance did not uncover "sources of supply or to establish a framework for the organization." *Id.* ¶¶ 102-106. Finally, the pen register and trap and trace devices only provided agents "with a list of numbers called" and would not "establish the identities of all the persons called or the contents of the conversation." *Id.* ¶ 142.

Additionally, the Government detailed why other normal investigative methods were unlikely to work. For example:

- Trash searches were unlikely to bear fruit because Burgos resides in a rural area that does not have curbside trash pickup and surveillance had not revealed any trash pickup service employed by Burgos. The affiant also stated that a trash search of Garcia's suspected residence was slated to occur, but agents may

encounter difficulty discerning which trash belongs to Garcia since he lives in a multi-family home. Wiretap Aff. ¶¶ 124-125, 129.

- Agents installed pole cameras near Burgos' residence to supplement other methods of physical surveillance but due to the rural location and technical difficulties—lack of a clear view of the residence and the camera freezing—they failed to provide any pertinent information to the investigation. Agents concluded that switching or maintaining the pole camera could jeopardize the investigation. The affiant states that he considered using a pole camera near Garcia's residence, but that it could risk detection. Also, because he lives with his girlfriend and her children, Garcia was unlikely to "conduct significant narcotics transactions at that location." *Id.* ¶¶ 130-132.
- Financial investigations alone could not achieve the goals of the investigation. Financial records would provide details about dates and locations and would also provide clues about the recipients of laundered drug proceeds. However, they would not provide information about the source of the proceeds or all the methods of money laundering. *Id.* ¶ 150.
- Grand Jury investigation or subpoenas were unlikely to yield results because it would alert the members of the conspiracy about the existence of an investigation and the subjects of the investigation if called to testify would likely flee or destroy evidence. *Id*. ¶¶ 120-121.

Thus, I find that the Government has shown that alternative investigative methods would likely fail and the necessity of a wiretap.

**<u>Conclusion</u>**

For the reasons stated above, Defendant's motion to suppress (Docket No. 110) is ***denied***.

**SO ORDERED**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**